IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DISTRICT

| | | |
|---|---|---|
| DON ASCARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 4:10-CV-01979 |
| | ) | |
| MASTERCARD INTERNATIONAL INCORPORATED, d/b/a MasterCard Worldwide | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S FIRST MOTION FOR SUMMARY JUDGMENT**

Respectfully Submitted,

**CAPES, SOKOL, GOODMAN & SARACHAN, P.C.**

By: /s/ Sheila Greenbaum
S. Todd Hamby #40367
Sheila Greenbaum #25422
7701 Forsyth, Twelfth Floor
St. Louis, Missouri 63105
Phone: (314) 721-7701
Fax: (314) 721-0554
Hamby@capessokol.com
Greenbaum@capessokol.com

Attorneys for Plaintiff

# TABLE OF CONTENTS

*Page(s)*

Table of Contents ........ i

Table of Authorities ........ ii

I. Introduction and Background ........ 1

II. Summary Judgment Should Not Be Granted ........ 4

A. Plaintiff's Whistleblowing Activity Was a Contributing Factor to Defendant's Decision to Terminate Him ........ 5

B. Plaintiff's Whistleblowing Regarding the Missouri State Tax Issue Was a Contributing Factor in His Termination. ........ 8

C. Plaintiff's Whistleblowing Regarding the New York State Tax Issue Was a Contributing Factor in His Termination. ........ 10

D. Plaintiff's Whistleblowing Regarding Employee Misclassification Was a Contributing Factor in His Termination ........ 11

E. Scope of Duty Issue ........ 19

F. Defendant is Not Entitled to Summary Judgment Judgment on Count II of Plaintiff's Complaint ........ 22

Attorney Client Privilege Issue ........ 30

Conclusion ........ 35

Certificate of Service ........ 36

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). .... 5

*Backman v. U.S. Postal Service*, No. Civ.04-3175, 2005 WL 2671534 (D. Minn. Oct. 3, 2005).. 9

*Barone v. United Indust. Corp.*, 146 S.W.3d 25, 31 (Mo. Ct. App. 2004). .... 31

*Bazzi v. Tyco Healthcare Group, LP*, No. 4:08-CV-2034, 2010 WL 1260141 (E.D. Mo. April 1, 2010). .... 16, 17, 21

*Boles Trucking, Inc. v. U.S.*, 77 F.3d 236 (8th Cir. 1996). .... 14

*Boyle v. Vista Eyeware, Inc.*, 700 S.W.2d 859 (Mo. Ct. App. 1985). .... 5

*Brannum v. Missouri Dept. of Corrections*, 518 F.3d 542, 547 (8th Cir. 2008). .... 8

*Brenneke v. Dept. of Missouri, Veterans of Foreign Wars of U.S. of Am.*, 984 S.W.2d 134, 139 (Mo. Ct. App., 1998). .... 29

*Brush v. Sears Holdings Corp.*, No. 11-10657, 2012 WL 987543 (11th Cir., March 26, 2012). .... 19, 20, 21

*Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 717 (8th Cir. 2000). .... 7

*Buytendrop v. Extendicare Health Serv., Inc.*, 498 F.3d 826, 834 (8th Cir. 2007). .... 29, 30

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). .... 4

*City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988)... 4

*Clark v. Beverly Enterprises-Missouri, Inc.*, 872 S.W.2d 522, 525 (Mo. Ct. App. 1994). .... 11

*Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99 (1st Cir. 2004). .... 19, 20, 21

*Custom Hardware Eng'g & Consulting, Inc. v. Dowell*, No. 4:10 CV 000653 ERW, 2011 WL 1743662 at *9 (E.D. Mo. May 5, 2011). .... 26

*Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 819 (Mo. banc 2007). ........................ 6

*Diversified Indust., Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977). .................................. 31

*Dunn v. Enter. Rent-A-Car Co.*, 170 S.W.3d 1, 7 (Mo. Ct. App. 2005). ..................... 8, 17, 18, 21

*EEOC v. HBE Corp.*, 135 F.3d 543 (8th Cir. 1998). ..................................................... 19, 20, 21

*Faust v. Ryder Commercial Leasing & Services*, 954 S.W.2d 383, 391 (Mo. Ct. App. 1997). ..... 7

*Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81 (Mo. banc 2010). ................ 5, 7, 17, 21, 25

*Genasci v. City of O'Fallon, MO* No. 4:06CV542 CDP, 2008 WL 3200812 (E.D. Mo. Aug. 6, 2008). ........................................................................................ 18

*Gray v. Bicknell*, 86 F.3d 1472, 1482 (8th Cir. 1996). ............................................................. 32

*Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir. 2008). ................................ 19, 20, 21

*Harris v. City of St. Louis*, No. 4:10CV1392, 2011 WL 1885387 (E.D. Mo. May 18, 2011)...... 15

*Hughes v. Freeman Health Sys.*, 283 S.W.3d 797, 801 (Mo. Ct. App. 2009). ............................ 18

*Int'l Tel. & Tel. Corp. v. United Tel. Co. of Florida*, 60 F.R.D. 177, 185 (M.D. Fla. 1973). ...... 31

*Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 101 (Mo banc 2010). ......................... 16, 23

*Kirk v. Mercy Hosp. Tri-Cnty.*, 851 S.W.2d 617, 621 (Mo. Ct. App. 1993). ........................ 16, 26

*Lewis v. Unum Corp. Severance Plan*, 203 F.R.D. 615, 619 (D. Kan. 2001). ............................ 31

*Lynch v. Blanke Baer & Bowey Krimko, Inc.*, 901 S.W.2d 147 (Mo. Ct. App. 1995). ............... 17

*McBryde v. Rittenour School Dist.*, 207 S.W.3d 162, 170 (Mo. Ct. App. 2006).......................... 6

*McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996). .......................................... 19, 20, 21

*McNerney v. Lockheed Martin Operations Support, Inc.*, No. 10-0704-CV-W, 2012 WL 2131826, *8 (W.D. Mo. June 12, 2012). ......................................................... 7, 16

*Margiotta v. Christian Hosp. Northeast Northwest*, 315 S.W.3d 342 (Mo. banc 2010). . 14, 15, 27

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). ................... 5

*PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 992 (8th Cir. 1999). ........... 32

*Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 731 (8th Cir. 2002). .................................... 30

*Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 937 (Mo. Ct. App. 1998). .................................. 7

*Ratcliff v. Sprint Missouri, Inc.*, 261 S.W.3d 534, 546 (Mo. Ct. App. 2008). ............................. 31

*Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 367-68 (8th Cir. 1994). ............................................ 11

*Schneider v. G. Guilliams, Inc.*, 976 S.W.2d 522, 526 (Mo. Ct. App. 1998). ............................. 27

*St. John's Reg'l Med. Ctr. v. Dally*, 90 S.W.3d 209, 215 (Mo. Ct. App. 2002). .......................... 34

*St. Louis Little Rock Hosp., Inc., v. Gaertner*, 682 S.W.2d 146, 150 (Mo. Ct. App. 1984). ........ 31

*Sims v. Greif, Inc.*, No. 4:10 CV 1257, 2011 WL 5901000 at *10 (E.D. Mo. Nov. 23, 2011)..... 28

*Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819-20 (8th Cir. 1998). .......................................... 9

*Smith v. St. Louis Univ.*, 109 F.3d. 1261, 1266 (8th Cir. 1997). .................................................... 9

*State v. Bulloch*, 826 S.W.2d 83, 85 (Mo. Ct. App., 1992). ........................................................ 23

*State v. Dumas*, 898 S.W.2d 689, 690 (Mo. Ct. App. 1995)........................................................ 31

*State v. Longo*, 789 S.W.2d 812, 815 (Mo. Ct. App. 1990)......................................................... 30

*State v. Storey*, 901 S.W.2d 886, 895-96 (Mo. banc 1995). ........................................................ 23

*State ex rel. Behrendt v. Neill*, 337 S.W.3d 727, 729 (Mo. Ct. App 2011). ................................ 32

*State of Idaho v. Peteja*, 83 P.3d. 781, 785 (Idaho Ct. App. 2003). ............................................ 26

*Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000) .................................................. 8

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). ......................................... 5

*U.S. v. Aguilar*, 515 U.S. 593, 600 (1995)..................................................................................... 25

*U.S. v. Matthews*, 505 F.3d 698, 708 (7th Cir. 2007). ................................................................. 25

*U.S. v. Reich*, 479 F.3d 179, 186 (2d Cir. 2007)........................................................................... 25

*U.S. v. Schoppert*, 362 F.3d 451, 457 (8th Cir. 2004)................................................................... 10

*U.S. v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998). ........................................................ 34

*Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011). .......................................... 5

*Zasaretti-Becton v. Habitat Co. of Missouri, LLC,* No. 4:12 CV 587, 2012 WL 2396868 (E.D. Mo. June 25, 2012). ........................................................... 27

**Statutes**

42 U.S.C. §2000e-3(a). ........................................................................................ 8,20

Mo. Rev. Stat. § 143.251. .................................................................................... 10, 13

Mo. Rev. Stat. § 285.515. ........................................................................................ 12

Mo. Rev. Stat. § 285.500. ........................................................................................ 12

Mo. Rev. Stat. § 143.241. ........................................................................................ 13

Mo. Rev. Stat. § 143.191. ........................................................................................ 13

26 U.S.C. § 3402(a). ............................................................................................ 13

I.R.S. Code § 414. ................................................................................................ 19

29 U.S.C. § 215(a)(3). ........................................................................................... 20

Mo. Rev. Stat. § 213.070(2) ....................................................................................... 20

Mo. Rev. Stat. § 575.100 (2012). ........................................................................ 23, 26

Mo. Rev. Stat. § 569.095(1) (2012). ................................................................... 24, 26

18 U.S.C. § 1512(c). ......................................................................................... 24, 25

18 U.S.C. § 1503. ................................................................................................ 25

I.C. § 18-2603 . .................................................................................................. 26

**Rules**

Fed. R. Civ. P. 56(c). ............................................................................................ 4

## Other Authorities

MAI § 38.03 n.1 (7th ed. 2012) ........................................................................................ 5

37 Mo. Prac. Employment Law & Practice § 12:14 (2011 ed.)..................................................... 8

http://www.dol.gov/whd/media/press/whdpressVB3.asp?pressdoc=Southeast/20120109.xml ... 12

12 C.S.R. 10-2.015.......................................................................................................................... 13

1 Paul R. Rice, Attorney-Client Privilege: State Law Missouri §2:1 (Westlaw 2010). ............... 31

## I. INTRODUCTION AND BACKGROUND

Plaintiff Don Ascare ("Plaintiff" or "Don") was wrongfully terminated by Defendant MasterCard International Incorporated ("Defendant" or "MasterCard") for his persistent whistle blowing activity. All of Don's superiors, peers, and subordinates testified that if Don believed Defendant was acting in a wrongful manner, he was willing to speak out. From the time he commenced his employment in 2005 until his termination, Don repeatedly challenged his superiors regarding Defendant's unlawful conduct. Don urged changes to MasterCard's actions to bring it into compliance, but Don was met with resistance and the status quo remained. In relation to his whistle blowing actions, one of Don's supervisors, Rob Reeg (President of MasterCard Technologies) warned him not to "piss off your colleagues." When it became clear to Don's superiors that he was never going to "get on board" with Defendant's "do as we please" culture, he was terminated.

As the head of Human Resources for MasterCard Technologies, Don was aware of the workers' activities. For many years, Defendant has improperly classified numerous workers as independent contractors[1] when the workers are in fact employees entitled to benefits and subject to taxation. In fact, Defendant's outside counsel stated to Don that Defendant's use of independent contractors was in violation of the law. Don repeatedly raised Defendant's noncompliance with his superiors to no avail. Regarding the independent contractor issue, Reeg testified that Don was "relentless" about trying to bring Defendant into compliance. The negative financial impact to Defendant if the workers were correctly classified as employees is estimated to be in the $200 million dollar range.

---

[1] The terms "leased employees" and "independent contractors" are used interchangeably in Plaintiff's documents in response to Defendant's motions for summary judgment.

Hoping to spark action, Don sent an email to Stephanie Voquer (one of his superiors) and attached three separate completed tests for proper worker classification. Each test unequivocally demonstrated the workers should be classified as employees and not independent contractors. Instead of embarking on a path of compliance with the law, Voquer's reaction was to: 1) instruct Don to send the email to Diane Dann (an in-house attorney) in hopes of cloaking it in the attorney client privilege, [redacted] Consistent with Voquer's actions and further demonstrating Defendant's willingness to skirt the law, Reeg (one of Defendant's highest ranking officers and Don's superior) testified, it's part of our legal system and appropriate for non-lawyer employees of MasterCard to send prior communications between themselves to a lawyer in order to cloak the communication in the attorney-client privilege.

Similarly, Don complained to his superiors about Defendant's blatant failure to withhold and pay state income tax for certain employees. George Spies, a long time friend and associate of Reeg, was allowed to be paid out of the MasterCard Florida office despite the fact he worked primarily in Missouri and Michigan. Florida has no income tax. For many years, Defendant improperly failed to withhold New York state income tax and pay New York taxes for numerous employees working in that state, but residing in other states. Don's assertions regarding this issue were proven correct and serious when a 2011 Withholding Tax Audit by New York for the years 2004 through 2006 resulted in an assessment against Defendant of over $320,000 in additional taxes and interest. True to his character and reputation, Don repeatedly raised these taxation issues with his superiors and colleagues, but to no avail.

Engaging in subterfuge, Defendant built a file against Don by conducting a sham investigation related to an alleged statement by Don regarding Jeff Villmer, a low level MasterCard employee.  Reeg was also Kim Hundley's boss and the two are long time friends and colleagues.  Hundley encouraged Villmer to make an official hotline complaint against Don.  The matter was of such importance to Hundley that he called the third party administrator of the hotline to make sure the complaint had been received.  Hundley then proceeded to improperly influence the investigation by providing false information about the allegations to purported witnesses before the MasterCard investigator interviewed them.  In order to manufacture a false reason to terminate Don, the MasterCard investigators quickly expanded the investigation beyond the Villmer allegation.  The investigators issued and shared with Voquer and Reeg preliminary findings of fact before even speaking to Don.

Defendant asserts Don was terminated because the Villmer investigation revealed: 1) that Don referred to a low level employee in a derogatory manner, and 2) broader problematic issues relating to Don's work performance.  Defendant's attempt to mask the truth by besmirching Don is transparent because the proffered reasons are contradicted by the evidence.  MasterCard employees admit that the use of curse words and derogatory comments about other employees by executives at MasterCard is not uncommon.  Further, Defendant had known for years that Don's "tell it like it is" attitude had ruffled some feathers, but Defendant's multiple reviews of Don's performance always resulted in high ratings.

Don's assistant, Cheryl Haley testified that after Don was fired, she was instructed by Reeg or his assistant to take Don's computer to Reeg's office.  Haley found this strange because it was not the usual procedure at MasterCard.  Reeg was so concerned about having Don's computer secure in his office that he also instructed Lois Miller to retrieve Don's computer for

him; Miller was a high level employee whose job title was Group Head of Human Resource Services and Solutions. Miller testified she had never been asked to retrieve a computer from other employees and it was not part of her normal job duties.

Regarding the remaining items in Don's office, Haley was instructed by MasterCard employee Patty Docherty not to pack up Don's personal belongings or remove anything. Haley thought this strange because usually the first thing that is done when an employee is fired is to pack up his or her personal belongings. Days later, when she did go into Don's office, she noticed that his personnel files with his handwritten notes were missing.

The totality of the evidence adduced thus far indicates that a contributing factor to Don's termination was his universally acknowledged occasions of speaking up and objecting when Defendant failed to follow the law.

## II. SUMMARY JUDGMENT SHOULD NOT BE GRANTED

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party has the initial burden to demonstrate that there exists no disputed fact and that it is entitled to judgment as a matter of law. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). If the moving party shows an absence of any genuine dispute and that it is entitled to judgment, the non-moving party must then set forth evidence and specific facts showing that

specific facts creating a genuine issue for trial exists or that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986).

In reviewing a motion for summary judgment, this Court is required to view the facts in a light most favorable to the non-moving party and to give the non-moving party the benefit of any inferences that can logically be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) ("This court reviews a grant of summary judgment de novo, viewing all evidence and drawing all reasonable inferences, without resort to speculation, in favor of the non-moving party."). Moreover, this Court is required to resolve all conflicts in favor of the non-moving party. *Id.* "Credibility determinations, weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (internal citations omitted).

Because the case at bar would require the Court to determine the credibility of statements or testimony made under oath, and to resolve genuine disputes as to the facts underlying the movant-Defendant's right to judgment, this case is not appropriate for summary judgment.

**A. Plaintiff's Whistleblowing Activity Was a Contributing Factor to Defendant's Decision to Terminate Him**.

The appropriate causation standard when an at-will employee alleges discharge in violation of the public-policy exception is whether the employee's activities constituted a "contributing factor" to the termination decision. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81 (Mo. banc 2010); MAI § 38.03 n.1 (7th ed. 2012). The *Fleshner* Court reflected that since *Boyle v. Vista Eyeware, Inc.*, 700 S.W.2d 859 (Mo. Ct. App. 1985), the court of appeals has recognized the public-policy exception to the at-will-employment rule. The Supreme Court in *Fleshner* took the opportunity to explicitly recognize the public-policy exception. *Id.* at 91.

The public-policy exception to the at-will employment doctrine was adopted by the Court as follows:

> An at-will employee may not be terminated: (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities. If an employer terminates an employee for either reason, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception.

*Id*. at 92. (internal citations omitted).

Public policy requires rejection of "exclusive causation" as the proper causal standard for the public-policy exception. The Court reasoned that "exclusive causation" would result in an exception that would fail to accomplish its task of protecting employees who refuse to violate the law or public policy, and noting that the majority of jurisdictions have not required proof of "exclusive causation" for wrongful discharge based on the public-policy exception. [2] The Court went on to explain that cases involving the public policy exception turn on whether an illegal factor played a role in the decision to discharge the employee; relevant evidence directly relates to the employer's intent or motivation. If an employee reports violations of the law or refuses to violate the law or public policy, it is a "contributing factor" to the discharge, and the discharge "is still reprehensible regardless of any other reasons of the employer." *Id*. at 94-95. As a very recent case reiterated, "[Plaintiff] is not required to show that her complaints were the sole cause, or even a substantial factor, in her termination. She is only required to show it was a

[2] A "contributing factor" is a condition that "contributes a share in anything or has a part in producing the effect." *McBryde v. Rittenour School Dist.*, 207 S.W.3d 162, 170 (Mo. Ct. App. 2006). The Supreme Court of Missouri rejected any requirement that a plaintiff prove discrimination was substantial or determining factor in an employment decision; it emphasized sufficiency of a protected characteristic contributing to the unfair treatment. *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 819 (Mo. banc 2007) (Missouri Human Rights Act context).

*contributing factor*." *McNerney v. Lockheed Martin Operations Support*, No. 10-1704-CV-W, 2012 WL 2131826, *7 (W.D. Mo. June 12, 2012) (emphasis in original) (internal citation omitted).

"[A] plaintiff need not rely on an employer's *direct* violation of a statute or regulation. Instead, the public policy must be *reflected by* a constitutional provision, statute, regulation promulgated pursuant to statute, or a rule created by a governmental body." *Fleshner*, 304 S.W.3d at 96 (internal citation omitted). In addition, there is no requirement that the violation(s) that the employee reports affect the employee personally, nor that the law violated, prohibit or penalize retaliation against those reporting its violation. Moreover, a plaintiff need not report or threaten to report his concerns to outside authorities; Missouri case law has recognized internal whistleblowing. *See Faust v. Ryder Commercial Leasing & Services*, 954 S.W.2d 383, 391 (Mo. Ct. App. 1997) (abrogated on other grounds by *Fleshner*); *Porter v. Reardon Mach. Co.*, 962 S.W.2d 932, 937 (Mo. Ct. App. 1998).

For a plaintiff to survive summary judgment, he must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions. *See Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 717 (8th Cir. 2000).

Defendant argues that Plaintiff's claim fails because he cannot establish Defendant violated the law. Such is not the mandate of case law. To successfully demonstrate opposition to a practice made unlawful by a statutory scheme, here for example, the overuse and inappropriate use of independent contractors, plaintiff need not show that the practice actually was unlawful. Instead, if a plaintiff establishes that he had a good faith, objectively reasonable

belief that the practice was unlawful, courts will consider the burden of demonstrating protected activity met. *See Dunn v. Enter. Rent-A-Car Co.*, 170 S.W.3d 1, 7 (Mo. Ct. App. 2005).

Plaintiff's persistence in bringing to the attention of higher-ups in MasterCard's organization the possible inappropriate use of independent contractors may be analogized to the opposition clause in Title VII (42 U.S.C. §2000e-3(a)). *See Brannum v. Missouri Dept. of Corrections*, 518 F.3d 542, 547 (8th Cir. 2008). The Eighth Circuit has held that a plaintiff-employee need not establish that the conduct he opposed was in fact prohibited under Title VII to meet the case law definition of protected activity. *Id.*; *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 634 (8th Cir. 2000) (to prove she engaged in a protected activity, plaintiff need not establish the conduct she opposed was in fact discriminatory.)

**B. Plaintiff's Whistleblowing Regarding the Missouri State Tax Issue Was a Contributing Factor in His Termination**

Defendant boldly asserts that Plaintiff cannot establish a nexus between his complaints regarding the tax implications of George Spies' work location and Plaintiff's termination because of the lapse in time between the complaints and the termination.

"In a sense, timing is a red herring. If the plaintiff has evidence that retaliation motivated the adverse action, the amount of time that has elapsed between the protected activity and the adverse action should not matter. On the other hand, while a short period of time may create an inference of retaliation, other evidence can always rebut this inference." 37 Mo. Prac., Employment Law & Practice §12:14 (2011 ed.). In the article, William C. Martucci reflects on the many Eighth Circuit cases that discuss the timing of adverse actions in relation to a plaintiff's protected activity, with the decision in each case as to whether the plaintiff established the requisite causal connection, "highly fact-specific." *Id.*

The passage of time between events does not by itself foreclose a claim of retaliation against an employer. Rather, it weakens an *inference of* retaliation that arises when the retaliatory act occurs shortly after a complaint. *Smith v. St. Louis Univ.*, 109 F.3d. 1261, 1266 (8th Cir. 1997) (summary judgment particularly inappropriate given Smith's case would likely rely on inferences, rather than direct evidence of department head's motivation). *See also Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 819-20 (8th Cir. 1998) (Court found periods of time between statutorily protected activity and adverse employment actions longer than the instant three month period were sufficient to create inference of requisite causal connections; Smith presented evidence in addition to timing that created jury question as to causal connection between Smith's [protected] activity and her termination). *Cf. Backman v. U.S. Postal Service,* No. Civ.04-3175, 2005 WL 2671534 (D. Minn. Oct. 3, 2005) (not reported in F.Supp. 2d) (inference of retaliation weakened because of 5-year time lapse; Backman failed to cure weak showing of temporal activity with substantial evidence of retaliatory intent).

Defendant relies on intervening events that occurred between the time Plaintiff alerted Voquer and Reeg to his concerns about the change in Spies' payroll to reflect a residency in Florida rather than Missouri, and the time when Plaintiff was terminated. There is a linkage, however, between and among the Missouri State and New York State Tax Issues and the Employee Misclassification Issue. The ligature is that illegal tax avoidance should not be facilitated by a corporate citizen such as Defendant. Spies wanted to go to Florida, an income tax free state, to avoid paying state income tax. Plaintiff did not condemn Spies' desire per se, but believed that it was not legal to change his withholding, as long as his primary location and work time was being spent in Missouri. (DATR 171:5-9; 173:10-18; 174:2-13, 17-21; 175:3-6).

Defendant claims that Plaintiff cannot establish an actionable whistleblower claim arising from the Missouri state tax issue "because the alleged wrongful conduct did not constitute a serious violation of law." (Defendant's Memorandum, p. 7). It may well be that Defendant does not consider tax evasion a serious violation of law. *See U.S. v. Schoppert*, 362 F.3d 451, 457 (8th Cir. 2004) (defendant charged with income tax evasion was not entitled to requested jury instruction that mere failure to pay a tax when due and owing is not a crime). At this juncture there is no definitive evidence as to whether Spies had or had not in fact paid any and all Missouri State income taxes he owed from 2007 through his retirement in 2010 (Defendant's Memorandum, p. 8). That was not Plaintiff's point then or now. The issue was Defendant's obligations to withhold tax and its actions and omissions in light of those obligations. *See* Mo. Rev. Stat. § 143.251.

**C. Plaintiff's Whistleblowing Regarding the New York State Tax Issue Was a Contributing Factor in His Termination**

Defendant eschews the possibility that Plaintiff's espousal of the need to properly withhold tax in regard to Defendant employees who worked in New York State could have influenced his termination from the company. Among those to whom Plaintiff voiced his concerns, was John Pagano. (DATR 181:1, 10-14). Defendant touts the fact that Pagano raised the issue of New York tax compliance with Voquer shortly after she assumed her role as Chief HR Officer, and she was supportive of doing what needed to be done in order to make sure that Defendant improved its reporting and withholding. (Defendant's Memorandum, p. 9). Though it took time for Defendant to bring its practices into compliance, in late 2010, employees began tracking and submitting their out-of-state travel time so that Defendant could withhold the correct state income taxes. Defendant cites this occurrence as an illustration of an employee, Pagano, who pursued this topic and remained employed at Defendant. The irony is that it

validates Plaintiff's concern about the matter. And, the possibility remains that Pagano gave attribution to Plaintiff for surfacing Defendant's previous non-compliance with New York State law.[3]

**D. Plaintiff's Whistleblowing Regarding Employee Misclassification Was a Contributing Factor in His Termination**

Defendant attempts to argue that employee misclassification does not contravene the law or recognized public policy. It would seem that both the federal and Missouri state governments beg to differ. The public policy protection to those whose employment is at-will is offered "because while there may be right to terminate a contract at will for no reason,… there can be no right to terminate for an unlawful reason or purpose that contravenes public policy." *Clark v. Beverly Enterprises-Missouri, Inc.*, 872 S.W.2d 522, 525 (Mo. Ct. App. 1994) (internal citation omitted).

The U.S. Department of Labor, Wage and Hour Division (WHD) has a section on their website devoted to "Employee Misclassification as Independent Contractors." It states:

> The misclassification of employees as something other than employees, such as independent contractors, presents a serious problem for affected employees, employers, and to the entire economy. Misclassified employees are often denied access to critical benefits and protections – such as family and medical leave, overtime, minimum wage and unemployment insurance – to which they are entitled. Employee misclassification also generates substantial losses to the Treasury and the Social Security and Medicare funds, as well as to state unemployment insurance and workers compensation funds.

[3] A key to establishing a causal connection focuses on employer's motivation or intention with regard to the termination. To establish a causal connection, the evidence should support a finding that retaliatory motive contributed to the termination. If employee would be protected because employer actually knew he or she had engaged in protected activity, employee would also be protected if employer merely believed or suspected he or she had engaged in protected activity. See generally *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 367-68 (8th Cir. 1994) (Secretary of Labor complained that Hoy had discharged employee in retaliation for activities protected under OSHA).

Press releases from the U.S. Department of Labor earlier this year discussed the results of investigations it had conducted.  Press releases labeled the misclassification as independent contractors, "an alarming trend."  The DOL observes that increasingly employers are categorizing their employees as independent contractors to avoid paying them in compliance with the FLSA, as well as other federal, state and local statutes…. misclassification costs tax payers millions of dollars each year in uncollected employment taxes.  *See*, e.g., http://www.dol.gov/whd/media/press/whdpressVB3.asp?pressdoc=Southeast/20120109.xml.

Missouri emphasizes 1099 Fraud in terms of Worker Misclassification.  Missouri's Division of Employment Security explains the consequences of 1099 fraud as follows:

> Employers that knowingly misclassify their employees face penalties in the amount of $50 to $1,000 per day per misclassified worker, and/or up to six months in jail per violation.  State statute allows the Division of Employment Security to penalize an employer 25 percent of the amount the state has been defrauded. …Knowingly failing to insure workers' compensation liability under the law is a class A misdemeanor, and is also punishable by a civil penalty of up to three times the annual premium the employer would have paid had it been insured or up to $50,000 whichever is greater.  To determine whether a worker is classified correctly, Missouri uses the IRS 20-factor test to identify his or her legal status.

The website is paraphrasing Mo. Rev. Stat. § 285.515 which reads as follows:

> If a court determines that an employer has knowingly misclassified a worker, the court shall enter a judgment in favor of the state and award penalties in the amount of fifty dollars per day per misclassified worker up to a maximum of fifty thousand dollars. The attorney general may enter into a consent judgment with any person alleged to have violated sections 285.500 to 285.515.

In addition, in September 2011, the U.S. Department of Labor, WHD and the Missouri Department of Labor and Industrial Relations entered into a partnership agreement to work collaboratively to promote compliance with laws of common concern.  Where appropriate and

allowable, the agencies agreed to conduct joint investigations periodically in the state of Missouri; to coordinate their respective enforcement activities and assist each other with enforcement; and to make referrals of potential violations of each other's statutes. (Partnership Agreement Between The U.S. Department of Labor, Wage and Hour Division and Missouri Department of Labor and Industrial Relations, particularly Subparts "Agency Responsibilities" and "Enforcement").

Defendant asserts that the various statutes and/or regulations cited by Plaintiff in support of his declaration that misclassifying leased employees is unlawful and/or against public policy, as inconsequential or irrelevant. The assertion by Defendant is rendered disingenuous. For example, 12 C.S.R. 10-2.015 Employers' Withholding of Tax relates to Missouri's income tax, a law which adopts many provisions and terms of the Internal Revenue Code. The term "wages" for Missouri withholding purposes has the same meaning as it has for federal withholding and statements of withholding are provided to employees on a W-2 form supplied by the IRS. An employer required to withhold Missouri income tax is personally liable for the tax. Any amount of tax actually deducted and withheld by an employer is a special fund in trust for the Director of Revenue (§143.241 RSMo) Of course, if a person is classified (or misclassified) as an independent contractor, taxes are not withheld, no W-2 is issued, and the independent contractor receives a 1099 form. Then, there is one less means for the federal or state government to track what a given citizen owes in taxes. [4]

[4] The applicability of other cited statutes is similar. For instance, an employer's failure to deduct and withhold taxes as required (e.g., as is the case when an employer is inappropriately treating a worker as an independent contractor instead of an employee), regardless of whether the tax is otherwise paid, the employer is not relieved from liability for any penalties, interest, or additions to tax. Mo. Rev. Stat. § 143.251 (companion statute is § 143.191, every employer shall deduct and withhold from wages, tax calculated by formula). The amount which must be withheld for Federal income taxes is determined according to 26 U.S.C. § 3402(a). Under the Internal

While Plaintiff championed the cause of coming into compliance with the laws regarding the appropriate use of leased employees, the issue of independent contractor legal risk was an ongoing subject before he became an employee of Defendant; he had been so informed by existing staff and within his first 90 days he and staff undertook an analysis of the length of time that contractors had spent in their positions at MasterCard. Outside counsel was "assigned the task of figuring out who would pay any fines or penalties that might have been imposed had there been a misclassification of independent contractors." (DATR 146:15-23). And, within the first 90 days of Plaintiff's joining Defendant, "Michael Lowenbaum came out for a meet-and-greet, and about 10 minutes into the conversation Michael raised the issue and said, 'By the way, you need to be greatly concerned with your use of leased employees or contractors, you guys are in violation of the law in that, and I have been telling these guys this for years.'" (DATR 147:12-25; 148:1-4).

Relying heavily on *Margiotta v. Christian Hosp. Northeast Northwest*, 315 S.W.3d 342 (Mo. banc 2010), Defendant states that the case "stands for the proposition that a plaintiff cannot establish an actionable whistleblower claim by opposing conduct the plaintiff subjectively believes to be improper, then, after the fact, locating a regulation or statute sufficiently vague and broad enough to arguably encompass the alleged improper conduct." Defendant's Memorandum, p. 10. Regardless of Defendant's characterization of the case, *Margiotta* does state that it cannot be left to the personal opinions and whims of judges or courts to decide what public policy requires. *Id*. at 346. "The pertinent inquiry [in the case was] whether the authority

Revenue Code, an employer is required to pay one-half of the total FICA taxes assessed against its employees, and withhold from paychecks those FICA taxes owed by employees themselves. Also, employer is obligated to pay FUTA taxes for its employees. Obligations are incumbent upon employer only if its workers are "employees" under the Tax Code. *See, Boles Trucking, Inc. v. U.S.*, 77 F.3d 236 (8th Cir. 1996).

clearly prohibits the conduct at issue in the action." *Id.* at 347. The Court decided that the authority cited by Margiotta did not grant him protected status for making complaints about acts or omissions he merely believed to be violations of the law or public policy. *Id*. at 348. (Judge Teitelman dissenting: principal opinion holds Margiotta's wrongful discharge claim fails because regulations cited do not proscribe specific conduct Margiotta reported to his superiors; such specificity is not required; regulations in this case express clear and important public policy).

Defendant's characterization of *Margiotta* provides the best platform for distinguishing Plaintiff's circumstances. First, Plaintiff did not oppose conduct he subjectively believed to be improper; rather, he advocated for examining and changing a practice by MasterCard that the company's own outside counsel had warned managers about and early on brought to Plaintiff's attention. Moreover, Plaintiff did not rout around to find a statutory or regulatory rationale to oppose the overuse, and any inappropriate use, of independent contractors. Whether or not in his exhortations on the subject Plaintiff cited with precision "chapter and verse" of the law, Defendant's counsel had instructed him about the perils of MasterCard's practices in regard to the use of independent contractors, and the tax consequences generally would have been within an HR manager's purview. In short, Plaintiff reported to his superiors serious misconduct that constituted violation of the law and of well established and clearly mandated public policy. *See Id.* at 347. *Cf. Harris v. City of St. Louis*, No. 4:10CV1392, 2011 WL 1885387 (E.D. Mo. May 18, 2011) (behavior plaintiff reported to her supervisor did not qualify as serious misconduct that constituted violation of law or public policy; rather, severity of infractions she alleged (reporting to supervisor that co-workers were sleeping, reading private reading materials, and using computer for personal use when they should have been working) rose only to level of routine office management decisions, not implicating a public policy wrongful-discharge claim);

*McNerney v. Lockheed Martin Operations Support, Inc.*, 2012 WL 2131826 at *8 (while court recognized that complained-of practices "raise eyebrows" and may not comport with agency's guidelines, plaintiff did not show they resulted in any financial loss, or could reasonably be inferred to have resulted in any financial loss to the United States and thus, practices did "not implicate the policy animating the False Claims Act").

The mandate of public policy finds its source in both the letter and purpose of a constitutional, statutory, or regulatory provision or scheme. *Keveney v. Missouri Military Acad.*, 304 S.W.3d 98, 101 (Mo. banc 2010); *Kirk v. Mercy Hosp. Tri-Cnty.*, 851 S.W.2d 617, 621 (Mo. Ct. App. 1993). Here, there is no stretch. The overuse and inappropriate use of contractors is condemned – and criminalized – by state and federal government.

Defendant asserts that plaintiff's claim is doomed to failure "because he cannot establish Defendant violated the law." Defendant's Memorandum, p. 13. Defendant posits that an employer's illegal intent is central to the public-policy exception to the at-will doctrine. The company relies on the unpublished district court case of *Bazzi v. Tyco Healthcare Group, LP*, No. 4:08-CV-2034, 2010 WL 1260141 (E.D. Mo. April 1, 2010). Bazzi, a doctor, sued his former employer, Tyco, alleging that Tyco wrongfully terminated his employment by violating Missouri's public-policy exception to the state's at-will employment doctrine. Specifically, Bazzi alleged that Tyco discharged him either because he refused to validate adulterated drugs or because he acted as a whistleblower by reporting that Tyco manufactured adulterated drugs. The district court granted Tyco's motion for summary judgment. Curiously, Defendant does not cite the Eighth Circuit opinion which affirmed summary judgment based on the district court's conclusion that Bazzi had failed to create any genuine issue of material fact concerning his claims. 652 F.3d 943 (8th Cir. 2011).

The Eighth Circuit acknowledged two lines of precedent in the Missouri Court of Appeals discussing the proof requirement for a plaintiff-employee to show that a defendant-employer violated a clearly expressed public policy. The Eighth Circuit further acknowledged that the evaluation of the *Bazzi* case was based on "*Dunn's* [*Dunn v. Enter. Rent-A-Car Co.*] view that a plaintiff's suspicion that an employer violated public policy must be objectively reasonable." *Id.* at 948. In his complaint, Bazzi had relied on one provision of the Food and Drug Act to support his claims: the Court related that Bazzi had failed to submit "even a scintilla of admissible evidence" showing what Tyco specifically did or did not do to the drug at issue and how that action or inaction rendered the drug adulterated in violation of the Food and Drug Act. [5]

A contrast to the *Bazzi* case also involved a plaintiff employed in a scientific job to maintain quality assurance of his employer's products by enforcing a regulation promulgated by the Food and Drug Administration (FDA) involving water activity in food products. *Lynch v. Blanke Baer & Bowey Krimko, Inc.*, 901 S.W.2d 147 (Mo. Ct. App. 1995) (abrogated on other grounds by *Fleshner*). The plaintiff distributed memoranda at executive committee meetings attended by company superiors, notifying the committee members that the company was not satisfying federal standards regarding water activity in food products. The plaintiff was subsequently discharged and brought suit for wrongful discharge. The trial court granted a directed verdict for the employer; the appellate court reversed and remanded finding that the plaintiff had made a submissible case. Evidence demonstrated that the employee was fired when

[5] Also among the facts distinguishing the *Bazzi* case from the instant matter are: Bazzi reported wrong-doing only to the wrong-doer; filed a charge of discrimination claiming he was unlawfully terminated because of his age and national origin; in his deposition, Bazzi testified he believed he would not have been terminated when he was if he had not been caught stealing and subsequently lying about his actions; he also testified that his termination would have occurred eventually as it was "only a matter of time."

he demanded action to correct employer practices and was told not to contact the FDA regarding violations, thus raising a jury question as to whether he was wrongfully discharged for reporting violations to his superiors, in violation of public policy. *Id*. at 151.

In another case drawing heavily upon *Dunn*, a plaintiff filed claims which included his assertion that, as relevant, he was entitled to coverage by the whistleblower protections. *Genasci v. City of O'Fallon, MO,* No. 4:06CV542 CDP, 2008 WL 3200812 (E.D. Mo. Aug. 6, 2008). Genasci was employed by the city as Director of Building Safety. He submitted reports to his supervisor and other city officials that the City was collecting and retaining excess Building Department fees as general revenue in violation of the Hancock Amendment. Based on a memorandum drafted by the city's attorney, which referred to the proposed fee increase in Genasci's department, the district court decided that a jury could find that based upon this legal opinion, Genasci reasonably believed that the proposed fee increase would violated the Hancock Amendment when he spoke to his supervisors regarding his concerns. Thus, the Court denied the City summary judgment on that claim. *Id.* at *6. *See also Hughes v. Freeman Health Sys.*, 283 S.W.3d 797, 801 (Mo. Ct. App. 2009) (registered nurse sued her former hospital employer contending she was terminated because she had refused to rewrite certain progress notes she had made in patient's record that were critical of a hospital physician; hospital claimed it had terminated nurse's employment because she had both failed to render proper care to patient and to accurately inform physicians of patient's condition; appellate court reversed trial court's grant of summary judgment in favor of hospital as two plausible but contradictory accounts of why she was terminated would require the drawing of inferences from disputed facts for resolution).

In its Memorandum, Defendant takes the tack that Plaintiff's statements regarding the Employee Misclassification Issue were subdued (p. 14). It is oxymoronic to portray Plaintiff as a

milquetoast on the subject where Reeg termed Plaintiff "relentless." Others at MasterCard described Plaintiff as direct, assertive and not afraid to speak up when he saw something being done that he thought was wrong. Plaintiff's email to Voquer, to which his risk analysis was attached, gave immediacy to the potential risk faced by Defendant in that he attached the labels "near-term, intermediate-term (through year-end '09) and longer-term."

Defendant tries to blithely dismiss the notion that Plaintiff's termination was related to his cautions about the Employee Misclassification Issue based on the example of Joanne Baker's discovery of a compliance issue (related to IRS Code § 414) and its being corrected by Defendant at a cost of approximately $5.5 million. The Joanne Baker anecdote is not germane to the case at bar. Moreover, the cost of the correction was a minute fraction of what the cost would be to correct inappropriate independent contractor classifications from years past. Moreover, the cost would be on-going and would radically change the very way in which Defendant conducted its business.

**E. Scope of Duty Issue.**

Defendant argues that "[Plaintiff's] Count I is not actionable because it is based solely upon the day-to-day activities [Plaintiff] undertook in the ordinary course of his role as a high-level HR executive." *See* Defendant's Memorandum, p. 17. Defendant postures that no Missouri state cases exist on point and, thus, cites five federal cases from various jurisdictions: *EEOC v. HBE Corp.*, 135 F.3d 543 (8th Cir. 1998); *McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996); *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617 (5th Cir. 2008); *Brush v. Sears Holdings Corp.*, No. 11-10657, 2012 WL 987543 (11th Cir., March 26, 2012); and *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99 (1st Cir. 2004). Each case is distinguishable.

In *McKenzie*, *Hagan*, and *Claudio-Gotay*, the respective plaintiffs brought claims for retaliatory discharge under Section 215(a)(3) of the Fair Labor Standard Act (FSLA). *McKenzie,* 94 F.3d at 1482*; Hagan*, 529 F.3d at 622; and *Claudio-Gotay,* 375 F.3d at 102. Such provision provides that, in order to state a claim, an employee must expressly assert a right adverse to the company:

> [I]t shall be unlawful for any person to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3). The cases cited by Defendant correctly assert that, with respect to statutory FLSA retaliatory discharge claims, a plaintiff must "step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that could be perceived as directed towards the assertion of rights protected by the FLSA." *See e.g., McKenzie,* 94 F.3d at 1486-87.

In *EEOC*[6] and *Brush*, the respective plaintiffs brought claims under Title VII's anti-retaliation provision, 42 U.S.C. §2000e-3(a). *EEOC*, 135 F.3d at 554; *Brush*, 2012 WL 987543 at *3. Section §2000e-3(a) of the statute makes it unlawful for an "employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." With respect to such claims, the employee must have "stepped outside" her normal employment

[6] The plaintiff in *EEOC* also brought a retaliatory discharge claim under Missouri's Human Rights Statute, Mo. Rev. Stat. 213.070(2) which largely tracks the language of §2000e-3(a).

role and engaged in a "protected activity," namely affirmatively opposing an unlawful employment practice or participating in an investigation, proceeding or hearing. *EEOC*, 135 F.3d at 554; *Brush*, 2012 WL 987543 at *3.

Finally, Defendant latches on to a quote from *Bazzi* which states that it was not the Court's "responsibility to micro-manage internal corporate compliance disagreements." 2010 WL at *6. However, the issue under Court scrutiny in *Bazzi* was not to what extent a plaintiff must operate outside the scope of his job duties in order to assert a whistle blowing claim. Rather, the Court was focusing on competing interpretations within the employer's legal compliance department, which was the origin of the quote utilized by Defendant. Consequently, *Bazzi* is inapt.

Unlike the plaintiffs' claims in *McKenzie*, *Hagan*, *Claudio-Gotay*, *EEOC* and *Brush*, Plaintiff's claims are not brought under Title VII or the FSLA statutes. Plaintiff's claims are grounded in Missouri common law which has carved an exception that affords at-will employees a cause of action for wrongful discharge. *Fleshner*, 304 S.W.3d at 92. Defendant states that no Missouri cases exist on point. Not only is Defendant mistaken, *Bazzi*, which is cited by Defendant, expressly refers to *Dunn*, which is on point. In *Dunn*, the appellate court reversed the trial court's directed verdict in favor of Dunn's employer on Dunn's Missouri common law wrongful discharge claim. Dunn was the employer's comptroller and it was his "responsibility as corporate comptroller to certify that the company's financial statements were prepared in accordance with GAAP [generally accepted accounting principles] for an initial public offering." 170 S.W.3d at 4. Dunn alleged that he was wrongfully terminated after reporting to his employer that it was using accounting methods in connection with its proposed IPO that were not in accordance with GAAP. *Id.* at 10. In short, it was Dunn's job duty to determine whether the

company was complying with GAAP. Under Missouri law, however, Dunn's claim was permissible, because, unlike Title VII and FSLA claims, there is no requirement that a plaintiff prove he acted contrary to the rights of his employer by filing a claim against them or affirmatively opposing the employer's actions. Missouri law requires only that a plaintiff was discharged as a result of reporting conduct, about which the employer had an objectively reasonable good faith belief, that there was a violation of law or public policy. Whether it was the plaintiff's job to do so is irrelevant.

Nonetheless, even if this Court were to determine that, in order to state a claim under Count I, Plaintiff must have been acting outside of the scope of his job duties, Defendant has judicially admitted such fact. In its Memorandum, Defendant states that "Stephanie Voquer did not believe Plaintiff to be qualified to perform the legal analysis he attempted in his August 19, 2009 e-mail and stated that she believed legal analyses were properly left to the law department, thus suggesting they involve Defendant's in house employment attorney, Diane Dann." Defendant's Memorandum, p. 24. If it wasn't Plaintiff's duty to make legal conclusions, in doing so, according to Defendant, Plaintiff was not acting within the scope of his job duties. Consequently, Defendant's argument that Plaintiff's Count I is not actionable is unsupported.

**F. Defendant is Not Entitled to Summary Judgment on Count II.**

In Count II of his Complaint, [redacted] To survive this motion with respect to Count II, Plaintiff must show that a genuine issue of material fact exists as to the elements necessary to support his claim for wrongful discharge – i.e., (1) that he refused to perform an illegal act or act in a manner contrary to public policy; (2)

that he was discharged; and (3) that there is a causal connection between his discharge and his refusal to engage in the actions at issue.  *Keveney v. Missouri Military Acad.*, 304 S.W.3d at 98. With respect to Count II, Defendant attacks the first and third prongs of Plaintiff's case.

Because Plaintiff was instructed to delete the Email for the specific purpose of curtailing any regulatory investigation into the Employee Misclassification Issue, his belief that such activity would be improper and thus "unauthorized" was reasonable. (DATR 138:23-139:2; 139:24-140:4). Accordingly, Defendant has not established, as a matter of law, that Plaintiff could not have been subject to criminal liability under 569.095.

criminal liability on one who corruptly “endeavors to influence, intimidate, or impede” an officer or juror or “influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice.” 18 U.S.C. § 1503.









[redacted] Aside from the fact that Defendant's argument is incorrect, such argument is also quite perplexing, given that MasterCard has chosen to utilize portions from that very conversation in support of its Motion for Summary Judgment. Consequently, Defendant waived its ability to assert privilege.

Defendant postures that, [redacted] he may not introduce such fact at trial. The argument is inconsistent with Missouri law.[8] In order to employ the attorney-client privilege, the party seeking to assert the privilege must prove that the:

> (1) Information [was] transmitted by voluntary act of disclosure; *(2) between a client and his lawyer*; (3) in confidence; and (4) by a means which, so far as a client is aware, discloses the information to no third parties other than those reasonably necessary for the transmission of the information or for the accomplishment of the purpose for which it is transmitted.

*State v. Longo*, 789 S.W.2d 812, 815 (Mo. Ct. App. 1990) (emphasis added). The requirement that such communication be made between an *attorney* and a *client* cannot be overemphasized.

[8] In diversity cases, Missouri law governs the applicability of privilege. *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 731 (8th Cir. 2002).

*State v. Dumas*, 898 S.W.2d 689, 690 (Mo. Ct. App. 1995) ("The privilege is limited to communications between the attorney and the client."); *Diversified Indust., Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977).  The legal principle is no different in the context of corporations. *See Barone v. United Indust. Corp.*, 146 S.W.3d 25, 31 (Mo. Ct. App. 2004) ("The attorney-client privilege attaches to communications between a corporation's counsel and top management.").  In addition, the attorney-client communication must be made *in order to secure legal advice*. *Ratcliff v. Sprint Missouri, Inc.*, 261 S.W.3d 534, 546 (Mo. Ct. App. 2008) ("To be privileged, the purpose of the communication between an attorney and client must be to secure legal advice."); *St. Louis Little Rock Hosp., Inc., v. Gaertner*, 682 S.W.2d 146, 150 (Mo. Ct. App. 1984).

In the instant case, the subject communication was not one between a lawyer and a client. Instead it was a communication between two non-lawyers, namely Plaintiff and Voquer.  The fact that Dann happened to be on the line, while an obvious attempt by Defendant to render such conversation privileged, is of no significance.  1 Paul R. Rice, Attorney-Client Privilege: State Law Missouri §2:1 (Westlaw 2010); *see also Lewis v. Unum Corp. Severance Plan*, 203 F.R.D. 615, 619 (D. Kan. 2001) ("[T]he mere attendance of an attorney at a meeting does not render everything done or said at that meeting privileged. For communications at such a meeting to be privileged, they must have related to the acquisition or rendition of professional legal services and must have retained a confidential character . . . To shield particular communications within a meeting from discovery, the party asserting the privilege must demonstrate that the particular communication was part of a request for advice or part of the advice ... [and] that the communication was intended to be and was kept confidential.") (collecting federal cases on the topic); *Int'l Tel. & Tel. Corp. v. United Tel. Co. of Florida*, 60 F.R.D. 177, 185 (M.D. Fla. 1973).

[redacted] and Voquer's statement was not a question meant to illicit a response from in-house counsel. Instead, it was a directive from a non-lawyer supervisor to her non-lawyer subordinate.

In addition, there is no evidence suggesting that the communication between Plaintiff and Voquer was to secure legal advice. [redacted] Consequently, the attorney-client privilege is inapplicable to the instant communication.

Nonetheless, even if privilege were applicable, Defendant has waived its ability to assert the same. Defendant repeatedly discusses the substance of the phone conversation in its Motion for Summary Judgment. *See* SOF, ¶¶ 119-121, *see also* Defendant's Memorandum, pp. 19-21, 23-24. In addition, Defendant's counsel chose to repeatedly question Plaintiff in his deposition concerning the substance of the conversation, DATR, March 30, 2012, at 134:15-135:16; 135:23-136:1; 139:24-140:16; 142:20-143:4, despite the fact that Defendant objected to Plaintiff's identical inquiry during the deposition of Voquer and Dann.

Voluntary disclosure of confidential information waives the attorney-client privilege. *State ex rel. Behrendt v. Neill*, 337 S.W.3d 727, 729 (Mo. Ct. App 2011); *PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 992 (8th Cir. 1999) ("The attorney/client privilege is waived by the voluntary disclosure of privileged communications, and courts typically apply such a waiver to all communications on the same subject matter."); *Gray v. Bicknell*, 86 F.3d 1472, 1482 (8th Cir. 1996) (interpreting Missouri law). There is no question that Defendant voluntarily permitted the disclosure of purported privileged information by questioning Plaintiff

regarding the phone conversation.  In addition, Defendant alleged the following in his Statement of Facts in Support of its Motion for Summary Judgment:



Defendant includes a footnote solely with respect to paragraph 119 of its Statement of Facts which states:



Such footnote is not associated with paragraphs 120 or 121.  With respect to paragraph 119, regardless of Defendant's underlying purpose for disclosing the substance of the conversation as identified in its footnote, the fact is that Defendant did just that—disclosed the substance of the conversation.  Moreover, to the extent Defendant attempts to preserve its ability to assert the privilege at trial by utilizing its footnote, the company offers no support for its ability to do so.  Discussing the substance of the communications in its Statement of Facts is a conscious, voluntary and strategic waiver of the attorney-client privilege.  The fact that Defendant sealed certain portions of its Statement of Facts is irrelevant.  Defendant did not request *in camera*

review. Consequently, Plaintiff, as a party to the case, and the Court can still see such allegations. Thus, Defendant waived its ability to assert the privilege.

Not only does Defendant repeatedly refer to the substance of the conversation, it attempts to use a portion of the conversation to its advantage in order to attempt to secure summary judgment. Defendant argues that, [redacted] *See* Defendant's Memorandum, pp. 19-20.

Defendant has waived its ability to assert privilege under these circumstances, as a result of Missouri's "fairness doctrine:"

> Privilege may also be waived when invoked in some fundamentally unfair way. The so called "fairness doctrine" is grounded in the notion that it is unfair to permit a party to make use of privileged information as a sword when it is advantageous for the privilege holder to do so, and then as a shield when the party opponent seeks to use privileged information that might be harmful to the privilege holder. The rationale is that a party should not be able to use a privilege to prejudice an opponent's case or to disclose some selected communications for self-serving purposes. Accordingly, a privilege may be waived when a party asserts a claim that in fairness requires examination of protected communications.

*St. John's Reg'l Med. Ctr. v. Dally*, 90 S.W.3d 209, 215 (Mo. Ct. App. 2002). Many jurisdictions, including Missouri, have historically invoked the fairness rationale (also known as the offensive use doctrine) in order to prevent a party from strategically invoking the privilege to exclude unfavorable information while at the same time admitting favorable information for its own benefit. *See* e.g., *Id.* at 216*; U.S. v. Workman*, 138 F.3d 1261, 1264 (8th Cir. 1998) ("The attorney client privilege cannot be used as both a shield and a sword…").

[redacted]

**CONCLUSION**

In the course of Plaintiff's tenure at MasterCard, true enough he was urged to fit in, acculturate and become more sensitive; however, he was consistently evaluated highly because his ideas and results were spot-on. Plaintiff's whistleblowing in regard to the Missouri State tax issue, the New York State tax issue, and most especially the Employee Misclassification Issue was a proverbial thorn in Defendant's side which had cost implications in the millions of dollars. Pursuant to a hotline complaint to the effect that Plaintiff had referred to a subordinate in a disparaging manner, Defendant instigated an investigation and contrived results to justify terminating Plaintiff's employment. Defendant's recount of comments about Plaintiff and his management style amounted to little more than a vilification.

The issues raised by Plaintiff represented his objectively reasonable belief that MasterCard's conduct was unlawful and/or in violation of public policy. Plaintiff "relentlessly" "blew the whistle" by reporting violations to his superiors, and the reporting constituted a contributing factor to Defendant's decision to end Plaintiff's employment.

WHERFORE, for the reasons set forth above, Plaintiff prays this Court make and enter its Order denying Defendant's Motion for Summary Judgment, order that the case go forward to Trial, and for such other relief as the Court deems proper.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 2nd day of July, 2012, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system, upon:

Robert W. Stewart, Esq.
Whitney D. Pile, Esq.
The Lowenbaum Partnership LLC
222 S. Central Ave., Suite 901
St. Louis, Missouri 63105

/s/ Sheila Greenbaum