UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DON ASCARE, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV1979 JCH |
| | ) | |
| MASTERCARD INTERNATIONAL | ) | |
| INCORPORATED d/b/a MasterCard | ) | |
| Worldwide, | ) | |
| | ) | |
| Defendant(s). | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant's First Motion for Summary Judgment (Merits) ("First Motion for Summary Judgment," ECF No. 58) and Defendant's Second (Alternative) Motion for Summary Judgment (Partial/Remedies) ("Second Motion for Summary Judgment," ECF No. 63), both filed on May 25, 2012. Both motions are fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Don Ascare ("Plaintiff" or "Ascare") was hired by Defendant MasterCard International Incorporated ("Defendant" or "MasterCard") to serve in the position of Senior Vice President of Human Resources in O'Fallon, Missouri, on June 5, 2005. (Complaint, ECF No. 6, ¶ 5). Plaintiff was terminated by Defendant on May 27, 2010. (Defendant's Statement of Uncontroverted Material Facts - First Motion for Summary Judgment ("Defendant's First SUMF"), ECF No. 59, ¶ 95).

I.      **Defendant's Statement of Facts**

     A.      **Plaintiff's Termination**

Plaintiff and Defendant dispute the reason for Plaintiff's termination. According to Defendant, Plaintiff was repeatedly told by his supervisors during his mid-year and year-end performance reviews that his "candid and direct style was contrary to the MasterCard culture," that Plaintiff should "be a little more sensitive to the current culture in place," and that Plaintiff should "try to be a little bit more sensitive to folks." (Defendant's First SUMF, ¶¶ 24, 30). Plaintiff's performance reviews also noted that he is "outspoken" and "needs to reach out earlier and more frequently to others," that Plaintiff "may be viewed as 'running over' others and not listening," and that "he should sharpen his listening skills and demonstrate openness to the viewpoints of others." (Id., ¶¶ 39, 40, 44). Plaintiff's performance reviews consistently noted he "delivered results" but that "the 'how' is 'not working.'" (Id., ¶ 41).

In February 2010, Jeff Villmer, a Business Leader in MasterCard's Office of Workforce management, made a phone call to MasterCard's ethics hotline to file a complaint against Plaintiff. (Id., ¶¶ 7, 9, 45, 52, 53). Another MasterCard employee had told Villmer several days earlier that Plaintiff recently called Villmer a "fucking weasel" and was unsupportive of a training event Villmer was setting up. (Id., ¶¶ 10, 45, 46). Villmer's complaint was investigated by Marianne Fogarty, an employee of the third party responsible for operating the ethics hotline, and Fogarty interviewed Villmer and several other MasterCard employees as part of the investigation. (Id., ¶¶ 14, 55, 58, 63, 68, 73). One employee told Fogarty about inappropriate comments she heard Plaintiff make while his office door was open, including one comment of a sexual nature, another comment regarding Plaintiff being drunk and throwing up everywhere, and comments regarding layoffs and employee bonuses. (Id., ¶¶ 65, 66). Another employee told Fogarty that she had also heard Plaintiff call Villmer a "fucking weasel" on a different occasion, and that Plaintiff told other employees during Plaintiff's first month at MasterCard that he was a bully who was going to implement a "big

shakeup." (Id., ¶¶ 69, 70).  Yet another employee told Fogarty that she thought many people were intimidated by Plaintiff's management style and offended by the way he spoke about people. (Id., ¶ 76).

Fogarty and her supervisor informed Plaintiff in person about the complaint in mid-May 2010. (Id., ¶ 81).  Fogarty and her supervisor prepared a final report containing a summary of the interviews they conducted, including the results of their interview with Plaintiff, and discussed their findings with Plaintiff's supervisors. (Id., ¶¶ 87, 88).  Plaintiff's supervisors met with Plaintiff on May 27, 2010, and informed him that his employment with MasterCard was terminated. (Id., ¶ 95).  Plaintiff was told he was being terminated because he had lost confidence in management and management had lost confidence in him. (Id., ¶ 97).  In Plaintiff's last full year as a Human Resources executive, his W-2 wages equaled $436,758. (Statement of Uncontroverted Facts, Filed in Conjunction with Defendant's Second (Alternative) Motion to Summary Judgment (Partial/Remedies) ("Defendant's Second SUMF"), ECF No. 65, ¶ 3).

### B.      Plaintiff's Post-MasterCard Activities

In December 2010, Plaintiff's wife wrote a "family Christmas letter" stating that Plaintiff

> [h]as decided to take some time off to enjoy the fruits of his hard work.  He's undecided as to what he'll do next, but he is definitely enjoying not working, although this "being retired is quite exhausting."  There's just so much to do when you don't have anything to do..."where does the day go"?

(Id., ¶ 11).  In 2010, after his termination, Plaintiff played poker at least 50 to 60 hours per week and sometimes played significantly more hours. (Id., ¶ 14).  In 2010, after his termination, Plaintiff averaged 10 to 15 hours per week at sporting clays shooting. (Id., ¶ 15).  For 2010, Plaintiff reported to the Internal Revenue Service ("IRS") that he lost $53,910.00 in his poker-playing/shooting ventures. (Id., ¶ 16).

During 2011, Plaintiff devoted 50 to 60 hours per week, and sometimes significantly more, to playing poker.  (Id., ¶ 18).  During 2011, since Plaintiff was focusing more on playing poker, he devoted fewer hours (3 to 5 hours per week) to sporting clays shooting.  (Id., ¶ 19).  For 2011, Plaintiff reported to the IRS that he lost $23,162.00 in his poker-playing/shooting ventures.  (Id., ¶ 20).

During 2012, Plaintiff diminished his poker-playing in order to work on this litigation.  (Id., ¶ 22).  Plaintiff was spending 20 to 25 hours per week playing poker in 2012.  (Id.).  Plaintiff continued to spend 3 to 5 hours per week at sporting clays shooting.  (Id., ¶ 23).  Plaintiff continued to lose money playing poker and shooting sporting clays in 2012.  (Id., ¶ 24).

## II.      Plaintiff's Statement of Facts

According to Plaintiff, he was rated "successful," "high successful," or "exceptional" in all of his annual performance reviews.  (Plaintiff's Statement of Additional Uncontroverted Material Facts that Preclude Summary Judgment ("Plaintiff's First SUMF"), ECF No. 82, ¶¶ 2-6).  Plaintiff was rated "high successful" in his 2009 performance review.  (Id., ¶ 2).  Plaintiff asserts he was terminated by MasterCard for advising his superiors and other MasterCard management employees that the company had been misclassifying leased employees, failing to withhold and pay Missouri income taxes for an employee that was improperly reported as an employee of MasterCard's office in Miami, and failing to withhold and pay New York state income taxes for employees that worked more than twelve days per year in New York. (Complaint, ¶¶ 8, 14, 15, 19).  Plaintiff also asserts he was terminated by MasterCard for ignoring his supervisor's instructions to delete an email containing a risk analysis that he had prepared and sent to her concerning the misclassification of leased employees.  (Id., ¶¶ 9, 10, 11, 24).

### A.      Missouri Tax Issue

During Plaintiff's employment with MasterCard, when an employee worked in more than one state, MasterCard typically withheld state income taxes from the state that was the employee's primary work location. (Defendant's First SUMF, ¶ 140). George Spies was a MasterCard employee first responsible for running the Global Debit Platform and later responsible for running Integrated Process Solutions. (Id., ¶ 141). When Plaintiff began his employment at MasterCard, Spies had an office in O'Fallon, Missouri, and owned a home in St. Louis. (Id., ¶ 142). Spies sold his house in Missouri in December 2006 and moved to Fort Meyers, Florida, in January 2007. (Id., ¶¶ 142, 143). In early December 2006, Spies asked Plaintiff and Plaintiff's supervisor if they would change his income-tax withholdings from Missouri to Florida. (Id., ¶ 148).

Plaintiff told his supervisor that he believed Spies's request was not legal, as Spies should be on the Missouri payroll as long as his primary location was in Missouri and he was primarily working in Missouri. (Id., ¶ 149). Plaintiff's supervisor ultimately instructed Plaintiff to make the change that Spies requested, and although Plaintiff believed it was an incorrect decision, Plaintiff agreed to make the change. (Id., ¶¶ 151, 152). When Plaintiff's supervisor was replaced in early 2008, Plaintiff had conversations with his new supervisors regarding Spies's payroll change, and Plaintiff stated that he thought the change was improper. (Id., ¶¶ 159, 161).

**B.     New York Tax Issue**

In 2006, after receiving his W-2 Form from MasterCard, Plaintiff raised the subject of New York taxes with one of his supervisors. (Id., ¶ 166). Plaintiff asked his supervisor why MasterCard was not withholding New York state taxes when he was working more than "12, 15" days in New York. (Id., ¶ 167). Plaintiff's supervisor said she did not know why New York taxes were not being withheld and told Plaintiff she would get back to him. (Id., ¶ 168).

- 5 -

Plaintiff raised the subject of withholding of New York state income taxes in December 2009 during a discussion with John Pagano, the Business Financial Officer of Global Human Resources. (Id., ¶¶ 6, 169).  Pagano had mentioned to Plaintiff in casual conversation that the State of New York was performing an audit on travel and expense reports.  (Id., ¶ 170).  Plaintiff asked Pagano if he had any concerns about Missouri employees' travel and expense reports when there were several Missouri employees spending a considerable amount of time in New York and New York state taxes were not being withheld from them.  (Id., ¶ 171).  At this time, Plaintiff did not raise the New York state tax subject with his current supervisors or with anyone else at MasterCard.  (Id., ¶¶ 173, 174, 175).  Plaintiff asserts, however, that Pagano spoke to one of Plaintiff's supervisors regarding the issue. (Plaintiff's Responses to Defendant's Statement of Uncontroverted Material Facts - First Motion for Summary Judgment ("Plaintiff's First Responses"), ECF No. 82, ¶ 175).

### C.    Independent Contractor Issue

Plaintiff states he repeatedly raised the independent contractor issue and was relentless in trying to bring MasterCard into compliance on this issue.  (Plaintiff's First SUMF, ¶¶ 25, 26). Plaintiff states his superiors and other high-level MasterCard employees were resistant to the changes he proposed.  (Id., ¶ 30).  Plaintiff estimates the independent contractor issue had a potential financial impact to MasterCard in the range of 200 million dollars.  (Id., ¶ 76).

According to Plaintiff, he prepared a risk analysis of this issue and emailed it to one of his supervisors on August 19, 2009.  (Complaint, ¶ 9).  On August 24, 2009, Plaintiff's supervisor told Plaintiff, in a telephone conversation on which in-house legal counsel Diane Dann was present, to delete the email containing the risk analysis.  (Plaintiff's First SUMF, ¶ 53).  Plaintiff states he was told to delete this email in order to render the email unavailable to any regulatory investigation, and Plaintiff believed this was unlawful.  (Id., ¶¶ 54, 55).  Plaintiff told his supervisor that he would delete

- 6 -

the email, but he did not delete it, and he did not inform his supervisor that he did not delete it. (Defendant's First SUMF, ¶¶ 121, 122). On August 25, 2009, Plaintiff forwarded the email to Dann. (Id., ¶ 124).[1] According to Plaintiff, he forwarded the email to Dann at the direction of his supervisor, but it is unclear when Plaintiff's supervisor instructed him to forward the email to Dann. (Plaintiff's First Responses, ¶ 124).

Defendant acknowledges that, some time in the third quarter of 2009, one of MasterCard's internal auditors conducted an audit of the Office of Workforce Management ("OWN"), at which time the issue around the use of leased employees and contractor times was raised. (Defendant's First SUMF, ¶ 126). Someone in OWN, who was not Plaintiff, raised the issue of the length of time that contractors were spending at MasterCard. (Id., ¶ 127). The responsibility of responding to the internal audit finding was assigned to Plaintiff in January 2010 after it had previously been assigned to another MasterCard employee. (Id., ¶ 129). By the time of Plaintiff's 2009 year-end review, the review and evaluation of MasterCard's co-employment risks had been assigned to outside legal counsel. (Id., ¶ 130). A few months after Plaintiff's employment with MasterCard ended, MasterCard adopted a formal policy on the treatment of contractors. (Id., ¶ 138).

### D. Plaintiff's Post-MasterCard Activities

According to Plaintiff, he has devoted in excess of 40 hours a week to his self-employment efforts of professional poker-playing and professional shooting since his termination from MasterCard. (Plaintiff's Statement of Additional Uncontroverted Material Facts that Preclude Summary Judgment ("Plaintiff's Second SUMF"), ECF No. 77, ¶ 1). Plaintiff states he has engaged in and pursued poker-playing with the objective and intention of making a profit, and that he has

---

[1]Defendant's Statement of Uncontroverted Material Facts states this occurred on August 25, 2010, but the Court assumes Defendant intended to state this occurred on August 25, 2009.

expended time and energy to make this pursuit profitable.  (Id., ¶ 2).  During 2011, Plaintiff traveled 110 days outside of the St. Louis area to play in various poker tournaments around the country.  (Id., ¶ 3).  Plaintiff believes that his professional poker-playing will someday be a profitable enterprise. (Id., ¶ 4).

## III.    The Current Lawsuit

Plaintiff filed this action on September 9, 2010, in the Circuit Court of St. Charles County, State of Missouri.  Defendant removed this action on October 20, 2010, on the basis of diversity jurisdiction.  Plaintiff's Complaint contains two counts: Count I alleges wrongful discharge for whistleblowing, and Count II alleges wrongful discharge for refusal to perform illegal acts. Defendant's Answer contains the following two affirmative defenses, among others:

### SECOND DEFENSE

Plaintiff has failed to mitigate any compensatory damages and/or back pay allegedly due to him by failing to be available for work, by failing actively and earnestly to search for work and by foregoing wages and benefits which could have been earned with reasonable diligence.

...

### FIFTH DEFENSE

Plaintiff's sole remedy to recoup for supposed emotional distress is provided under the Missouri Workers' Compensation Act and exclusive jurisdiction over such issues is vested in the Missouri Division of Workers' Compensation.

(Answer, ECF No. 11, p. 3).

As noted above, Defendant filed both motions for summary judgment (ECF Nos. 58 and 63) on May 25, 2012.

### STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." FED. R. CIV. P. 56(e); Anderson, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. Anderson, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. Anderson, 477 U.S. at 255. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Id. at 249.

## DISCUSSION

### I.   Defendant's First Motion for Summary Judgment

Defendant's First Motion for Summary Judgment is directed to all of Plaintiff's wrongful discharge claims. Accordingly, the Court will address Defendant's First Motion for Summary Judgment first.

Missouri maintains the default rule of at-will employment for employees without employment contracts for a definite term: an employer may discharge an at-will employee for any reason or for

no reason without liability for wrongful discharge.  Taylor v. St. Louis County Bd. of Election Comm'rs, 625 F.3d 1025, 1027 (8th Cir. 2010) (citing Sivigliano v. Harrah's N. Kan. City Corp., 188 S.W.3d 46, 48 (Mo. Ct. App. 2006)). However, the Supreme Court of Missouri has recognized limited exceptions to the at-will employment doctrine:

> An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body, or (2) for reporting wrongdoing or violations of law to superiors or public authorities.

Id. (citing Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 92 (Mo. 2010)).  "Therefore, if an employer terminates an employee for either reason, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception."  Fleshner, 304 S.W.3d at 95.

To succeed on a claim for wrongful discharge in violation of public policy under Missouri law, a plaintiff must establish that: (1) she refused to violate the law or a well-established and clear mandate of public policy, or reported such a violation to a superior or public authority; (2) the defendant terminated her employment; (3) her refusal or report was a contributing factor in her termination; and (4) as a result of her discharge, she sustained damage.  Keveney v. Mo. Military Acad., 304 S.W.3d 98, 103 (Mo. 2010); Custom Hardware Eng'g & Consulting, Inc. v. Dowell, No. 4:10CV653, 2011 WL1743662, at *9 (E.D. Mo. May 5, 2011); cf. MAI § 38 .03.

"The mere citation of a constitutional or statutory provision in a [pleading] is not by itself sufficient to state a cause of action for retaliatory discharge," as "the plaintiff must demonstrate that the public policy mandated by the cited provision is violated by the discharge."  Margiotta v. Christian Hosp. Northeast Northwest, 315 S.W.3d 342, 347 (Mo. 2010) (citing 82 AM. JUR. 2D § 61).  The pertinent inquiry is whether the authority clearly prohibits the conduct at issue in the action.  Id.

**A.    Wrongful Discharge for Whistleblowing**

In Count I, Plaintiff alleges he was wrongfully discharged for reporting a violation of the law or a well-established and clear mandate of public policy to a superior.  Defendant's Motion for Summary Judgment takes two approaches to arguing for the dismissal of Count I of Plaintiff's Complaint: first, Defendant addresses each individual compliance issue identified by Plaintiff and argues that, standing alone, Plaintiff's complaints with regards to that individual issue are insufficient to sustain a wrongful discharge claim; and second, Defendant argues Plaintiff's job duties required him to report compliance issues so as to negate any inference that the reporting of any compliance issue resulted in Plaintiff's termination.  The Court will address Defendant's argument as to Plaintiff's general obligation to report all compliance issues before turning to Defendant's arguments as to the individual compliance issues identified by Plaintiff.

### 1.    Plaintiff's Job Duties

Defendant argues Plaintiff cannot establish his whistleblower complaints under Count I because, by reporting potentially unlawful practices at MasterCard, Plaintiff was simply performing the day-to-day activities required by his role as a high-level Human Resources executive.  In support of this argument, Defendant cites Bazzi v. Tyco Healthcare Group, LP, No. 4:08CV2034, 2010 WL 1260141 (E.D. Mo. Apr. 1, 2010).  The court in Bazzi based its decision to grant summary judgment in favor of the defendant-employer on the plaintiff-employee's wrongful discharge claim on the plaintiff's failure to present evidence that any illegal activity actually occurred.  See id. at *7.  The court went on to note that the plaintiff's whistleblower claim also failed because the plaintiff reported the allegedly illegal activity to his superior, who was the alleged "wrongdoer," which did not constitute a protected activity.  Id.  The court stated that, to allege a claim for whistleblowing, the plaintiff needed to report illegal action undertaken by *other* employees to a superior.  Id.

- 11 -

The court's decision in Bazzi has no application to this case.  Plaintiff has presented evidence that Defendant may not have been compliant with state tax laws in Missouri and New York, and Plaintiff has presented evidence that Defendant may have been misclassifying its independent contractors.  Plaintiff does not allege that his superiors committed the original violations of which he complained of; rather, Plaintiff alleges his superiors took no corrective action after he brought such violations to their attention.  Any statements in Bazzi regarding a court's "responsibility to micro-manage internal corporate compliance disagreements" or similar sentiments are dicta.  See id. at *6.

Defendant also cites to EEOC v. HBE Corp., 135 F.3d 543 (8th Cir. 1998) and McKenzie v. Renberg's Inc., 94 F.3d 1478 (10th Cir. 1996).  Both of these cases concern claims for retaliatory discharge for opposing illegal conduct, not wrongful discharge claims for whistleblowing--thus, to show opposition to allegedly illegal conduct, the plaintiffs in both cases needed to show they actively took steps to oppose such conduct.  Additionally, in HBE Corp., 135 F.3d at 554, the Eighth Circuit Court of Appeals found the plaintiff had shown he was "stepping outside" his employment role by refusing to implement a discriminatory policy, as his "normal managerial role" was "to further company policy."  According to Plaintiff, he repeatedly challenged MasterCard policy on several issues and refused to follow his supervisor's directive to delete his risk analysis regarding the independent contractor issue.  The Court cannot say, as a matter of law, that Plaintiff's tenacity regarding these compliance issues and Plaintiff's refusal to follow his supervisor's order did not affect Defendant's determination that Plaintiff had lost confidence in management.  (See Defendant's First SUMF, ¶ 97).

### 2.   Missouri Tax Issue

Defendant argues Plaintiff cannot establish that his complaints regarding George Spies's work location contributed to his termination because the lapse in time between his complaints and his

termination negates any inference of causation.  Defendant also argues that the allegedly wrongful conduct concerning Spies's tax classification does not rise to the level of "serious misconduct" so as to support a claim for wrongful discharge.

Here, the Court finds there is a genuine issue of material fact as to whether Plaintiff's statements regarding Spies's tax classification contributed to his termination.  Viewing the facts in the light most favorable to Plaintiff, Defendant has not shown that Plaintiff's complaints regarding Spies were not a contributing factor in Plaintiff's termination.  While years may have passed between Plaintiff's original complaint and Plaintiff's termination, it is clear that Plaintiff brought Spies's tax classification to his superiors' attention on numerous occasions.  Again, the Court cannot say, as a matter of law, that Plaintiff's tenacity regarding this issue did not affect Defendant's determination that Plaintiff had lost confidence in management.  (See Defendant's First SUMF, ¶ 97).

Additionally, the Court is unwilling to hold that an employer's intentional and improper tax classification of an employee is not "serious misconduct."  Plaintiff asserts Defendant improperly classified Spies for tax purposes and continued to improperly classify Spies even after Plaintiff brought the error to his superiors' attention.  In support of Plaintiff's claim that he was terminated for reporting violations of the law to his superiors, Plaintiff cites MO. REV. STAT. § 143.251, which provides as follows:

> If an employer fails to deduct and withhold tax as required, and thereafter the tax against which such tax may be credited is paid, the tax so required to be deducted and withheld shall not be collected from the employer. The employer shall not be relieved thereby from liability for any penalties, interest, or additions to tax otherwise applicable in respect to such failure to deduct and withhold.

MO. REV. STAT. § 143.251 (2012).  This statute states that an employer is still liable for any penalties for the failure to withhold state taxes, even if such taxes are eventually paid.  Thus, this statute clearly prohibits the conduct at issue in this action (i.e., the failure to withhold state taxes).  See Margiotta,

315 S.W.3d at 347. Again, viewing the facts in the light most favorable to Plaintiff, Defendant has not shown that Plaintiff's complaints regarding Spies were not a contributing factor in Plaintiff's termination.

### 3. New York Tax Issue

Defendant argues Plaintiff cannot establish a whistleblower claim arising from his alleged complaints regarding the New York tax issue because the individuals responsible for his termination were unaware that Plaintiff had raised the issue. According to Defendant, Plaintiff raised the issue with one of his previous supervisors and with John Pagano, the Business Financial Officer of Global Human Resources.

Viewing the facts in the light most favorable to Plaintiff, the Court finds a genuine issue of material fact exists as to whether Plaintiff's supervisors at the time of his termination were aware that Plaintiff had raised the issue of New York taxes. Plaintiff has presented evidence that he raised the issue with a previous supervisor and with Pagano. Plaintiff has also presented evidence that Pagano discussed the issue with one of Plaintiff's two supervisors at the time of his termination. While Plaintiff may not have had one-on-one conversations regarding New York taxes with the supervisors who were responsible for his termination, the Court cannot say, as a matter of law, that these supervisors had no knowledge that Plaintiff raised this issue. Thus, Defendant has not shown that Plaintiff's complaints regarding New York taxes were not a contributing factor in Plaintiff's termination.

### 4. Independent Contractor Issue

Defendant argues Plaintiff cannot establish a whistleblower claim arising from his alleged complaints regarding the independent contractor issue because he cannot cite a sufficiently definite statute, regulation, or constitutional provision prohibiting the allegedly wrongful conduct. Defendant

also argues Plaintiff's whistleblower claim regarding the independent contractor issue fails because Plaintiff cannot establish that Defendant violated the law.  Finally, Defendant asserts Plaintiff's whistleblower claim regarding the independent contractor issue must fail because similarly situated employees who raised similar compliance issues were not subject to adverse employment actions.

Viewing the facts in the light most favorable to Plaintiff, the Court finds a genuine issue of material fact exists as to whether Plaintiff's statements regarding the independent contractor issue contributed to his termination. First, Defendant appears to have abandoned its argument that Plaintiff has failed to demonstrate how the misclassification of leased employees violated the legal authorities Plaintiff relies on, as Defendant's Reply notes that "Plaintiff...incorrectly states that MasterCard does not view the misclassification of independent contractors as being a violation of law and public policy." (Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's First Motion for Summary Judgment ("Defendant's First Reply"), ECF No. 87, p. 8). Thus, Defendant concedes in its Reply that Plaintiff has established his whistleblower claims with regards to the independent contractor issue inasmuch as Plaintiff has adequately alleged that he reported violations of law and public policy to his superiors.

Second, contrary to Defendant's assertions, it is unclear under Missouri law as to whether an employee must actually prove the underlying illegal or wrongful action in order to succeed on a whistleblower claim.  Both Plaintiff and Defendant conflate two separate issues: whether the underlying conduct, as alleged, is illegal, and whether the plaintiff has presented sufficient evidence to show that the underlying conduct actually occurred.  The Missouri Supreme Court's decision in Margiotta dealt with the former situation.  In Margiotta, 315 S.W.3d at 344-45, the plaintiff brought a wrongful termination claim against his former employer, alleging that the employer terminated him for reporting violations of federal and state patient safety regulations to his supervisors.  The Missouri

Supreme Court held that the federal regulation was too vague to support the plaintiff's claim and that the Missouri regulation concerned building safety, not patient treatment, and thus was not applicable. Id. at 348.  The court noted that "[w]hat Margiotta asks this Court to do is to grant him protected status for making complaints about acts or omissions he merely believes to be violations of the law or public policy. The public policy exception to the at-will doctrine is not so broad."  Id.  Thus, Margiotta concerned underlying conduct that was not prohibited by the regulations cited by Plaintiff and that was therefore not illegal.  See also Zasaretti-Becton v. Habit Co. of Missouri, LLC, No. 4:12CV 587, 2012 WL 2396868, at *7-8 (E.D. Mo. June 25, 2012) (finding the plaintiff failed to establish claim for wrongful discharge where the defendant's allegedly wrongful conduct did not violate the statutory provisions cited by plaintiff, and where the plaintiff's reasonable belief that such conduct was unlawful was insufficient to establish claim).  As noted above, Defendant has conceded that the misclassification of independent contractors is a violation of law and public policy.

The decision of the Eighth Circuit Court of Appeals in Bazzi v. Tyco Healthcare Group, LP, 652 F.3d 943, 948 (8th Cir. 2011), while citing Margiotta, rests on a different conclusion: the plaintiff in Bazzi failed to present "even a scintilla of admissible evidence" that the defendant engaged in the allegedly wrongful conduct.  The issue in Bazzi was not whether the alleged conduct was wrongful; rather, the issue was whether the plaintiff presented sufficient evidence that such conduct actually occurred.

Defendant's argument is more in line with Bazzi than Margiotta: "the reason why MasterCard is entitled to summary judgment is because Plaintiff has set forth no evidence whatsoever indicating that MasterCard, at any time, misclassified its employees as independent contractors."  (Defendant's First Reply, p. 8).  Nonetheless, Defendant admits that, shortly after Plaintiff prepared his risk analysis regarding this issue, an internal audit was conducted that raised the issue of the length of time that

contractors were spending at MasterCard.  Defendant also admits that MasterCard adopted a new formal policy on the treatment of contractors several months after Plaintiff's employment with MasterCard ended.  Thus, the Court finds there is sufficient evidence to create an issue of fact as to whether MasterCard was misclassifying its employees at the time that Plaintiff raised his concerns.

Third, the Court finds that the fact that similarly situated employees who raised similar compliance issues regarding independent contractors were not subject to adverse employment actions is insufficient to enter judgment in Defendant's favor.  Plaintiff argues, and Defendant acknowledges, that Plaintiff raised three separate compliance issues with his superiors.  Defendant has not pointed to any other MasterCard employees who raised the same three compliance issues, and thus Defendant has not identified any MasterCard employees who were similarly situated to Plaintiff.  Again, the Court cannot isolate Plaintiff's complaints regarding the classification of independent contractors from Plaintiff's complaints regarding the other two compliance issues, as the cumulative effect of Plaintiff's complaints regarding all three compliance issues may have resulted in Plaintiff's termination.  Thus, the Court finds a question of fact exists as to whether Plaintiff's complaints regarding the classification of independent contractors were a contributing factor in Plaintiff's termination.  Defendant's First Motion for Summary Judgment as to Count I of Plaintiff's Complaint must therefore be denied.

### B.     Wrongful Discharge for Refusal to Perform Illegal Acts

In Count II, Plaintiff alleges he was wrongfully discharged for refusing to violate the law or a well-established and clear mandate of public policy.  Defendant argues Plaintiff cannot establish a wrongful termination claim arising from his alleged refusal to delete his risk analysis email regarding the independent contractor issue because the decisionmakers responsible for Plaintiff's termination

were unaware that he failed to perform the allegedly illegal conduct.  Defendant also argues Plaintiff cannot establish a wrongful termination claim arising from his alleged refusal to delete his risk analysis email regarding the independent contractor issue because the conduct allegedly requested of Plaintiff was not illegal and did not rise to the level of "serious misconduct that constitutes a violation of the law and of...well-established and clearly mandated public policy."  Finally, Defendant argues Plaintiff cannot establish a wrongful termination claim arising from his alleged refusal to delete his risk analysis email regarding the independent contractor issue because the conduct allegedly requested of Plaintiff occurred in the course of a conversation protected by the attorney-client privilege.

Under this public policy exception to the at-will doctrine Plaintiff must establish that Defendant asked him to perform an illegal act, that he refused to do so, and that he was discharged for the failure to do so.  Hess v. Sanofi-Synthelabo, Inc., 503 F.Supp.2d 1178, 1186 (E.D. Mo. 2007) (citing Dunn v. Enterprise Rent-A-Car Co., 170 S.W.3d 1, 7 (Mo. Ct. App. 2005)).

Viewing the facts in the light most favorable to Plaintiff, the Court finds Plaintiff was not asked to perform an illegal act and that, therefore, his termination was not in violation of the public policy exception to the at-will employment doctrine.[2]  In his Memorandum in Opposition, Plaintiff cites three statutes that he alleges would have been violated by the deletion of the risk analysis email: tampering with physical evidence, MO. REV. STAT. § 575.100; tampering with computer data, MO. REV. STAT. § 569.095.1; and tampering with a witness, victim, or an informant, 18 U.S.C. § 1512(c).[3]

---

[2]Therefore, the Court declines to address Defendant's additional arguments with regards to Count II.

[3]Plaintiff's Complaint cites the following additional grounds for finding that the deletion of the risk analysis email was illegal: MO. REV. STAT. § 537.525, Missouri public policy discouraging the spoliation of evidence, Missouri public policy discouraging the interference with investigations by regulatory agencies, and Missouri public policy discouraging corporate malfeasance. (Complaint, ¶ 23).  The Court finds § 537.525 inapplicable, as it simply states the remedies available to a party whose computer data was tampered with.  The Court also finds Plaintiff's

Those statutes provide as follows:

§ 575.100. Tampering with physical evidence

1.  A person commits the crime of tampering with physical evidence if he:

(1) Alters, destroys, suppresses or conceals any record, document or thing with purpose to impair its verity, legibility or availability in any official proceeding or investigation....

MO. REV. STAT. § 575.100 (2012).

§ 569.095. Tampering with computer data, penalties

1. A person commits the crime of tampering with computer data if he knowingly and without authorization or without reasonable grounds to believe that he has such authorization:

(1) Modifies or destroys data or programs residing or existing internal to a computer, computer system, or computer network....

MO. REV. STAT. § 569.095.1 (2012).

§ 1512. Tampering with a witness, victim, or an informant

....

(c) Whoever corruptly–

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512 (2008).

---

invocation of Missouri public policy insufficient, as the general public policy considerations noted by Plaintiff do not clearly prohibit the conduct at issue in this action.  See Margiotta, 315 S.W.3d at 347.

None of the statutes cited by Plaintiff suggest the deletion of the risk analysis email would have been a violation of the statutes themselves or of public policy.  First, no official proceeding or investigation was in effect so as to trigger § 575.100.  Plaintiff cites to <u>State v. Storey</u>, 901 S.W.2d 886 (Mo. 1995) for the proposition that no official investigation needs to be underway in order for a violation of § 575.100 to occur.  <u>Storey</u> concerned a criminal defendant convicted of first-degree murder who was also convicted of tampering after he "wiped down [the victim's] apartment, cleaned under her fingernails, and collected and discarded evidence" after stabbing her and hitting her in the face and head.  <u>Storey</u>, 901 S.W.2d at 895-96.  The defendant in <u>Storey</u> argued § 575.100 was inapplicable because no investigation was in force at the time he altered or destroyed evidence, and the Missouri Supreme Court found § 575.100 contained no requirement that an official proceeding could not be impaired until it begins.  <u>Id.</u> at 896.

The situation in this case stands in stark contrast to the facts in <u>Storey</u>.  The defendant in <u>Storey</u> killed a woman, thereby ensuring an imminent official investigation by law enforcement officers.  Additionally, the defendant in <u>Storey</u> acted with the clear purpose of hindering law enforcement in its inevitable investigation of his crime.  In this case, Plaintiff had no knowledge that an official investigation was going to occur, or even that something illegal had happened.  Furthermore, Plaintiff merely suspected that the directive to delete the risk analysis email was for the purpose of hiding the email from a potential investigation, and there is no indication that the absence of Plaintiff's analysis would have hindered any subsequent investigation.[4]  Thus, Plaintiff's belief that a hypothetical official investigation by some regulatory authority might someday occur and might be

---

[4]The Court also questions whether Plaintiff's risk analysis email would have been unavailable for regulatory review, given that Plaintiff was allegedly instructed to forward it to in-house counsel and was only instructed to delete it from his "sent" folder.

impaired by the failure to discover the risk analysis email is insufficient to trigger the application of § 575.100.

Second, Plaintiff was not acting without authorization under § 569.095.1. Plaintiff created the risk analysis email, and his supervisor instructed him to delete it. Regardless of Plaintiff's subjective belief that deleting the email would be contrary to MasterCard's internal policies, Plaintiff was granted the express authority to delete the email. Therefore, § 569.095.1 is inapplicable.

Finally, no "official proceeding" was in effect so as to trigger § 1512. Section 1515 defines "official proceeding" as follows:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce....

18 U.S.C. § 1515(a) (1996). "Official proceeding" is consistently used throughout § 1512 in a manner that contemplates a formal environment in which persons are called to appear or produce documents. U.S. v. Ramos, 537 F.3d 439, 463 (5th Cir. 2008). Thus, courts construe "official proceeding" narrowly. See Ramos, 537 F.3d at 463 (the Border Patrol's internal investigation of alleged employee misconduct is not "an official proceeding" within the meaning of § 1512(c)); U.S. v. Binette, 828 F.Supp.2d 402 (D. Mass 2011) ("Preliminary investigation" by the Securities and Exchange Commission was not "official proceeding" under § 1512(c)); Park South Associates v. Fischbein, 626 F.Supp. 1108, 1113 (S.D.N.Y. 1986) (Section 1512(c) does not apply to proceedings

in state courts or before state administrative bodies).  Again, Plaintiff's belief that a hypothetical official investigation by some regulatory authority might someday occur is insufficient under the plain language of the statute.  Thus, § 1512 is inapplicable.  Defendant's First Motion for Summary Judgment as to Count II of Plaintiff's Complaint must therefore be granted.

## II.     Defendant's Second Motion for Summary Judgment

In the alternative, Defendant has filed its Second Motion for Summary Judgment directed to Plaintiff's allegations regarding emotional and mental distress and lost income and benefits of employment.  Since the Court determined Defendant's First Motion for Summary Judgment will only be granted as to Count II, the Court will now address Defendant's Second Motion for Summary Judgment.

### A.     Jurisdiction Over Claims for Emotional and Mental Distress

Defendant argues the Court lacks subject-matter jurisdiction over Plaintiff's claims for emotional and mental distress because such allegations are barred by the exclusivity provision of Missouri's Workers' Compensation Law, MO. REV. STAT. § 287.120.2.  Section 287.102.2 states that "[t]he rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee...at common law or otherwise, on account of such accidental injury or death, except such rights and remedies as are not provided for by this chapter."  MO. REV. STAT. § 287.120.2 (2012).  Plaintiff's Complaint provides that he "has been damaged in that he has suffered and continues to suffer lost income, lost benefits of employment, and emotional and mental distress." (Complaint, ¶¶ 20, 25).

Missouri's Workers' Compensation Law provides the exclusive remedy for injuries "arising out of and in the course of the employee's employment."  MO. REV. STAT. § 287.120.1 (2012).  An injury for emotional distress as a result of a discriminatory discharge does not arise in the course of

employment.  <u>Kientzy v. McDonnell Douglas Corp.</u>, 990 F.2d 1051, 1060-61 (8th Cir. 1993).  In

<u>Kientzy</u>, the Eighth Circuit Court of Appeals determined that Missouri's Workers' Compensation

Law did not provide the exclusive remedy for an employee's emotional distress brought on by her

discharge on the basis of sex discrimination.  <u>Id.</u> at 1061.  The Eighth Circuit found that the plaintiff's

unemployment, which was a result of her discriminatory discharge, caused her emotional distress, and

that workers' compensation laws did not apply to her claim.  <u>Id.</u>

   Here, the Court finds that Plaintiff's claims for emotional and mental distress are not barred

by Missouri's Workers' Compensation Law.  Contrary to Defendant's arguments, Plaintiff's

purported emotional and mental distress directly arose from his unemployment--regardless of whether

Plaintiff allegedly suffered such distress in the immediate aftermath of his termination or during the

weeks following his termination, such distress did not "aris[e] out of and in the course of" Plaintiff's

employment.  Section 287.120.2 does not bar Plaintiff's claims for emotional and mental distress.

Defendant's Second Motion for Summary judgment must be denied with regards to this Court's

subject-matter jurisdiction over Plaintiff's claims for emotional and mental distress.

   **B.**  **Mitigation of Damages**

   Defendant also argues Plaintiff cannot obtain relief for lost income and lost benefits of

employment because Plaintiff failed to mitigate his damages.  In a wrongful discharge action, the

defendant-employer bears the burden of proving that the plaintiff-employee's recovery should be

reduced for the failure to mitigate.  <u>Stewart v. Bd. of Educ. of Ritenour Consol. Sch. Dist., R-3</u>, 630

S.W.2d 130, 134 (Mo. Ct. App. 1982).  "It is not enough for the employer to prove that the plaintiff

made no effort to get other employment, but he must go further and prove that such employment

could have been secured."  <u>Id.</u> (quoting McCormick *Damages* 628 (1975)).

- 23 -

In <u>Stewart</u>, the court held that the defendant, a school board, failed to meet its burden of proof with regards to the plaintiff-teacher's alleged failure to mitigate damages. <u>Id.</u> at 134. The defendant presented three witnesses at trial who were in charge of hiring teaching personnel in different metropolitan school districts, and all three witnesses testified that there were teaching jobs available in the area during the plaintiff's period of unemployment and that the plaintiff was qualified for these positions. <u>Id.</u> The witnesses also testified that none of their districts had hired a teacher in the plaintiff's age bracket, with the plaintiff's qualifications, who had been discharged from another school district, within the past five years. <u>Id.</u> Based on this evidence, the court noted that the plaintiff's chances of finding a teaching job were "slim at best." <u>Id.</u> at 135. The court found that the defendant did not have to conclusively prove that the plaintiff would have obtained a comparable job, but the defendant did have to show it was "reasonably likely" that the plaintiff would have obtained such a job. <u>Id.</u>

Here, Defendant has not met its burden of proof with regards to Plaintiff's alleged failure to mitigate damages. Defendant has presented no evidence indicating it was reasonably likely that Plaintiff would have obtained a job comparable to the one he had with Defendant. While Defendant has presented evidence that Plaintiff was not actively looking for a job comparable to the job he had with Defendant, this is insufficient to prove, as a matter of law, that Plaintiff failed to mitigate his damages. Therefore, Defendant's Second Motion for Summary judgment must be denied with regards to Plaintiff's alleged failure to mitigate damages.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's First Motion for Summary Judgment (Merits) (ECF No. 58) is **GRANTED** in part and **DENIED** in part in accordance with the foregoing.

**IT IS FURTHER ORDERED** that Defendant's Second (Alternative) Motion for Summary Judgment (Partial/Remedies) (ECF No. 63) is **DENIED**.


Dated this 16th day of August, 2012.


/s/Jean C. Hamilton
UNITED STATES DISTRICT JUDGE